551 So.2d 1186 (1989)
In re T.W., a Minor.
No. 74143.
Supreme Court of Florida.
October 5, 1989.
Rehearing Denied December 4, 1989.
*1187 Ann Marshall-Jones, Crawfordville, for Florida Chapter of Nat. Organization for Women, amicus curiae.
Charlene Miller Carres, Tallahassee, for American Civil Liberties Union Foundation of Florida, Inc., amicus curiae.
Dara Klassel, New York City, for Planned Parenthood Federation of America, Inc., amicus curiae.
Kenneth L. Connor of Connor & Associates, Tallahassee, and Ann-Louise Lohr of Americans United for Life Legal Defense Fund, Chicago, Ill., for A Bi-Partisan Group of Florida Legislators and Florida Right to Life, Inc., amici curiae.
Richard W. Boylston, Tavares, and James Bopp, Jr. and Richard E. Coleson of Brames, McCormick, Bopp & Abel, Terre Haute, Ind., for appellants.
Jerri A. Blair of Carr & Blair, P.A., Leesburg, appellee.
Robert A. Butterworth, Atty. Gen., Gerald B. Curington, Director, General Legal Services, Mitchell D. Franks, Asst. Deputy Atty. Gen., and George L. Waas, Asst. Atty. Gen., Tallahassee, for State of Fla., intervenor.
*1188 Richard F. Wolfson, Miami Beach, for American Jewish Congress, Southeast Region, amicus curiae.
SHAW, Justice.
We have on appeal In re T.W., 543 So.2d 837 (Fla. 5th DCA 1989), which declared unconstitutional section 390.001(4)(a), Florida Statutes (Supp. 1988), the parental consent statute. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We approve the opinion of the district court and hold the statute invalid under the Florida Constitution.

I.
The procedure that a minor must follow to obtain an abortion in Florida is set out in the parental consent statute[1] and related rules.[2] Prior to undergoing an abortion, a *1189 minor must obtain parental consent or, alternatively, must convince a court that she is sufficiently mature to make the decision herself or that, if she is immature, the abortion nevertheless is in her best interests. Pursuant to this procedure, T.W., a pregnant, unmarried, fifteen-year-old, petitioned for a waiver of parental consent under the judicial bypass provision on the alternative grounds that (1) she was sufficiently mature to give an informed consent to the abortion, (2) she had a justified fear of physical or emotional abuse if her parents were requested to consent, and (3) her mother was seriously ill and informing her of the pregnancy would be an added burden. The trial court, after appointing counsel for T.W. and separate counsel as guardian ad litem for the fetus, conducted a hearing within twenty-four hours of the filing of the petition.
The relevant portions of the hearing consisted of T.W.'s uncontroverted testimony that she was a high-school student, participated in band and flag corps, worked twenty hours a week, baby-sat for her mother and neighbors, planned on finishing high school and attending vocational school or community college, had observed an instructional film on abortion, had taken a sex education course at school, would not put her child up for adoption, and had discussed her plans with the child's father and obtained his approval. She informed the court that due to her mother's illness, she had assumed extra duties at home caring for her sibling and that if she told her mother about the abortion, "it would kill her." Evidence was introduced showing that the pregnancy was in the first trimester.
The guardian ad litem was accorded standing and allowed to argue that the judicial bypass portion of the statute was unconstitutionally vague and that parental consent must therefore be required in every instance where a minor seeks to obtain an abortion. The trial court ruled that the judicial bypass provision of the statute was unconstitutional because it failed to make sufficient provision for challenges to its validity, was vague, and made no provision for testimony to controvert that of the minor. The court denied the petition for waiver and required T.W. to obtain parental consent under the remaining provisions of the statute.
The district court found that the statute's judicial alternative to parental consent was unconstitutionally vague, permitting arbitrary denial of a petition, and noted the following defects: failure to provide for a record hearing, lack of guidelines relative to admissible evidence, a brief forty-eight-hour time limit, and failure to provide for appointed counsel for an indigent minor. The court declared the entire statute invalid, quashed the trial court's order requiring parental consent, and ordered the petition dismissed. The guardian ad litem appealed to this Court. The Florida Attorney General was granted permission to appear as amicus curiae. The guardian filed a number of motions to block the abortion but was unsuccessful and T.W. lawfully ended her pregnancy, which would normally moot the issue of parental consent.
Because the questions raised are of great public importance and are likely to recur, we accept jurisdiction despite T.W.'s abortion. See Holly v. Auld, 450 So.2d 217 *1190 (Fla. 1984). Preliminarily, we find that the appointment of a guardian ad litem for the fetus was clearly improper. The attorney general alone has standing to pursue this appeal.[3]
It cannot be doubted that the constitutional integrity of the laws of Florida is a matter in which the State has great interest, or that the State is a proper, but not necessary, party to any determination of the constitutionality of any state statute. Since many constitutional challenges are raised in a trial court which can be simply disposed of as obviously meritless, it would be futile for the Attorney General to defend each statute against all constitutional challenges at the trial level. However, where the trial court finds a statute to be unconstitutional, it is proper that the Attorney General appear on appeal to defend the statute.
State ex rel. Shevin v. Kerwin, 279 So.2d 836, 837-38 (Fla. 1973).
The seminal case in United States abortion law is Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There, the Court ruled that a right to privacy implicit in the fourteenth amendment embraces a woman's decision concerning abortion. Autonomy to make this decision constitutes a fundamental right and states may impose restrictions only when narrowly drawn to serve a compelling state interest. The Court recognized two important state interests, protecting the health of the mother and the potentiality of life in the fetus, and ruled that these interests become compelling at the completion of the first trimester of pregnancy and upon viability of the fetus (approximately at the end of the second trimester), respectively. Thus, during the first trimester, states must leave the abortion decision to the woman and her doctor; during the second trimester, states may impose measures to protect the mother's health; and during the period following viability, states may possibly forbid abortions altogether. Although the workability of the trimester system and the soundness of Roe itself have been seriously questioned in Webster v. Reproductive Health Services, ___ U.S. ___, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), the decision for now remains the federal law. Subsequent to Roe, the Court issued several decisions dealing directly with the matter of parental consent for minors seeking abortions. See Planned Parenthood Ass'n v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); City of Akron v. Akron Center for Reproductive Health Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion); Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).
To be held constitutional, the instant statute must pass muster under both the federal and state constitutions. Were we to examine it solely under the federal Constitution, our analysis necessarily would track the decisions noted above. However, Florida is unusual in that it is one of at least four states having its own express constitutional provision guaranteeing an independent right to privacy, see Note, Toward a Right of Privacy as a Matter of State Constitutional Law, 5 Fla.St.U.L. Rev. 632, 691 (1977) (others include Alaska, California, and Montana),[4] and we opt to examine the statute first under the Florida Constitution. If it fails here, then no further analysis under federal law is required.
*1191 As we noted in Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla. 1985), the essential concept of privacy is deeply rooted in our nation's political and philosophical heritage. Justice Brandeis in Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), eloquently expressed the fundamental and wide-ranging "right to be let alone":
The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect... . They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone  the most comprehensive of rights and the right most valued by civilized men.
Pursuant to this principle, the United States Supreme Court has recognized a privacy right that shields an individual's autonomy in deciding matters concerning marriage, procreation, contraception, family relationships, and child rearing and education. Roe, 410 U.S. at 152-53, 93 S.Ct. at 726-27. It is this general right to privacy that protects against the public disclosure of private matters. Nixon v. Administrator of General Servs., 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The Court, however, has made it clear that the states, not the federal government, are the final guarantors of personal privacy: "But the protection of a person's general right to privacy  his right to be let alone by other people  is, like the protection of his property and of his very life, left largely to the law of the individual States." Katz v. United States, 389 U.S. 347, 350-51, 88 S.Ct. 507, 510-11, 19 L.Ed.2d 576 (1967) (footnotes omitted; emphasis in original). While the federal Constitution traditionally shields enumerated and implied individual liberties from encroachment by state or federal government, the federal Court has long held that state constitutions may provide even greater protection. See, e.g., Pruneyard Shopping Center v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980) ("Our reasoning ... does not ex proprio vigore limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.").
State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law  for without it, the full realization of our liberties cannot be guaranteed.
W. Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L.Rev. 489, 491 (1977).
In 1980, Florida voters by general election amended our state constitution to provide:
Section 23. Right of privacy.  Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
Art. I, § 23, Fla. Const. This Court in Winfield described the far-reaching impact of the Florida amendment:
The citizens of Florida opted for more protection from governmental intrusion when they approved article I, section 23, of the Florida Constitution. This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy. Article I, section 23, was intentionally phrased in strong terms. The drafters of the amendment rejected the use of the words "unreasonable" or "unwarranted" before the phrase "governmental intrusion" in order to make the privacy right as strong as possible. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly *1192 provides for a strong right of privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.
Winfield, 477 So.2d at 548. In other words, the amendment embraces more privacy interests, and extends more protection to the individual in those interests, than does the federal Constitution.
Consistent with this analysis, we have said that the amendment provides "an explicit textual foundation for those privacy interests inherent in the concept of liberty which may not otherwise be protected by specific constitutional provisions."[5]Rasmussen v. South Fla. Blood Serv., 500 So.2d 533, 536 (Fla. 1987) (footnote omitted). We have found the right implicated in a wide range of activities dealing with the public disclosure of personal matters. See Barron v. Florida Freedom Newspapers, 531 So.2d 113 (Fla. 1988) (closure of court proceedings and records); Rasmussen (confidential donor information concerning AIDS-tainted blood supply); Winfield (banking records); Florida Bd. of Bar Examiners re: Applicant, 443 So.2d 71 (Fla. 1983) (bar application questions concerning disclosure of psychiatric counselling). Florida courts have also found the right involved in a number of cases dealing with personal decisionmaking. See Public Health Trust v. Wons, 541 So.2d 96 (Fla. 1989) (refusal of blood transfusion that is necessary to sustain life); Corbett v. D'Alessandro, 487 So.2d 368 (Fla. 2d DCA), review denied, 492 So.2d 1331 (Fla. 1986) (removal of nasogastric feeding tube from adult in permanent vegetative state); In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984) (removal of life support system from brain-dead infant); see also Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980) (removal of respirator from competent adult, decided prior to passage of privacy amendment under general right of privacy).
The privacy section contains no express standard of review for evaluating the lawfulness of a government intrusion into one's private life, and this Court when called upon, adopted the following standard:
Since the privacy section as adopted contains no textual standard of review, it is important for us to identify an explicit standard to be applied in order to give proper force and effect to the amendment. The right of privacy is a fundamental right which we believe demands the compelling state interest standard. This test shifts the burden of proof to the state to justify an intrusion on privacy. The burden can be met by demonstrating that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means.
Winfield, 477 So.2d at 547. When this standard was applied in disclosural cases, government intrusion generally was upheld as sufficiently compelling to overcome the individual's right to privacy. We reaffirm, however, that this is a highly stringent standard, emphasized by the fact that no government intrusion in the personal decisionmaking cases cited above has survived.
Florida's privacy provision is clearly implicated in a woman's decision of whether or not to continue her pregnancy. We can conceive of few more personal or private decisions concerning one's body that one can make in the course of a lifetime, except perhaps the decision of the terminally ill in their choice of whether to discontinue necessary medical treatment. See Wons; Perlmutter.
Of all decisions a person makes about his or her body, the most profound and intimate relate to two sets of ultimate questions: first, whether, when, and how one's body is to become the vehicle for another human being's creation; second, when and how  this time there is no question of "whether"  one's body is to terminate its organic life.
*1193 L. Tribe, American Constitutional Law 1337-38 (2d ed. 1988). The decision whether to obtain an abortion is fraught with specific physical, psychological, and economic implications of a uniquely personal nature for each woman. See Roe, 410 U.S. at 153, 93 S.Ct. at 727. The Florida Constitution embodies the principle that "[f]ew decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision ... whether to end her pregnancy. A woman's right to make that choice freely is fundamental." Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 2185, 90 L.Ed.2d 779 (1986).
The next question to be addressed is whether this freedom of choice concerning abortion extends to minors. We conclude that it does, based on the unambiguous language of the amendment: The right of privacy extends to "[e]very natural person." Minors are natural persons in the eyes of the law and "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, ... possess constitutional rights." Danforth, 428 U.S. at 74, 96 S.Ct. at 2843. See also Ashcroft; City of Akron; H.L. v. Matheson, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981); and Bellotti.

II.
Common sense dictates that a minor's rights are not absolute; in order to overcome these constitutional rights, a statute must survive the stringent test announced in Winfield: The state must prove that the statute furthers a compelling state interest through the least intrusive means. The Roe Court recognized two state interests implicated in the abortion decision: the health of the mother and the potentiality of life in the fetus. Under Roe, the health of the mother does not become a compelling state interest until immediately following the end of the first trimester because until that time, "mortality in abortion may be less than mortality in normal childbirth." Roe, 410 U.S. at 163, 93 S.Ct. at 731. Due to technological developments in second-trimester abortion procedures, the point at which abortions are safer than childbirth may have been extended into the second trimester. See City of Akron, 462 U.S. at 429 n. 11, 103 S.Ct. at 2492 n. 11. We nevertheless adopt the end of the first trimester as the time at which the state's interest in maternal health becomes compelling under Florida law because it is clear that prior to this point no interest in maternal health could be served by significantly restricting the manner in which abortions are performed by qualified doctors, whereas after this point the matter becomes a genuine concern. See id. Under Florida law, prior to the end of the first trimester, the abortion decision must be left to the woman and may not be significantly restricted by the state. Following this point, the state may impose significant restrictions only in the least intrusive manner designed to safeguard the health of the mother.[6] Insignificant burdens during either period must substantially further important state interests. Compare id. at 430, 103 S.Ct. at 2492 ("Certain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state health objectives.").
Under Roe, the potentiality of life in the fetus becomes compelling at the point in time when the fetus becomes viable, which the Court defined as the time at which the fetus becomes capable of meaningful life outside the womb, albeit with artificial aid. Roe, 410 U.S. at 160, 163, 93 S.Ct. at 730, 731. Under our Florida Constitution, the state's interest becomes compelling upon viability, as defined below. Until this point, the fetus is a highly specialized set of cells that is entirely dependent upon the mother for sustenance. No other member of society can provide this nourishment. The mother and fetus are so inextricably intertwined that their interests can be said to coincide. Upon viability, however, society *1194 becomes capable of sustaining the fetus, and its interest in preserving its potential for life thus becomes compelling.[7]See Webster, 109 S.Ct. at 3075 (Blackmun, J., concurring/dissenting). Viability under Florida law occurs at that point in time when the fetus becomes capable of meaningful life outside the womb through standard medical measures. Under current standards, this point generally occurs upon completion of the second trimester. See id. at 3075 n. 9 (no medical evidence exists indicating that technological improvements will move viability forward beyond twenty-three to twenty-four weeks gestation within the foreseeable future due to the anatomic threshold of fetal development). Following viability, the state may protect its interest in the potentiality of life by regulating abortion, provided that the mother's health is not jeopardized.

III.
The challenged statute fails because it intrudes upon the privacy of the pregnant minor from conception to birth. Such a substantial invasion of a pregnant female's privacy by the state for the full term of the pregnancy is not necessary for the preservation of maternal health or the potentiality of life. However, where parental rights over a minor child are concerned, society has recognized additional state interests  protection of the immature minor and preservation of the family unit. For reasons set out below, we find that neither of these interests is sufficiently compelling under Florida law to override Florida's privacy amendment.
In evaluating the validity of parental consent and notice statutes, the federal Court has taken into consideration the state's interests in the well-being of the immature minor, see Ashcroft; City of Akron; Matheson; Bellotti; Danforth, and in the integrity of the family, see Matheson; Bellotti. In Bellotti, the Court set forth three reasons justifying the conclusion that states can impose more restrictions on the right of minors to obtain abortions than they can impose on the right of adults: "[T]he peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." Bellotti, 443 U.S. at 634, 99 S.Ct. at 3043. The Court pointed out that "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," id. at 635, 99 S.Ct. at 3044, and that the role of parents in "teaching, guiding, and inspiring by precept and example is essential to the growth of young people into mature, socially responsible citizens," id. at 638, 99 S.Ct. at 3045. In assessing the validity of parental consent statutes, the federal Court applied a relaxed standard; the state interest need only be "significant," not "compelling," to support the *1195 intrusion.[8]
We agree that the state's interests in protecting minors and in preserving family unity are worthy objectives. Unlike the federal Constitution, however, which allows intrusion based on a "significant" state interest, the Florida Constitution requires a "compelling" state interest in all cases where the right to privacy is implicated. Winfield. We note that Florida does not recognize these two interests as being sufficiently compelling to justify a parental consent requirement where procedures other than abortion are concerned. Section 743.065, Florida Statutes (1987), provides:
743.065 Unwed pregnant minor or minor mother; consent to medical services for minor or minor's child valid. 
(1) An unwed pregnant minor may consent to the performance of medical or surgical care or services relating to her pregnancy by a hospital or clinic or by a physician licensed under chapter 458 or chapter 459, and such consent is valid and binding as if she had achieved her majority.
(2) An unwed minor mother may consent to the performance of medical or surgical care or services for her child by a hospital or clinic or by a physician licensed under chapter 458 or chapter 459, and such consent is valid and binding as if she had achieved her majority.
(3) Nothing in this act shall affect the provisions of s. 390.001 [the abortion statute].
Under this statute, a minor may consent, without parental approval, to any medical procedure involving her pregnancy or her existing child  no matter how dire the possible consequences  except abortion. Under In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984) (parents permitted to authorize removal of life support system from infant in permanent coma), this could include authority in certain circumstances to order life support discontinued for a comatose child. In light of this wide authority that the state grants an unwed minor to make life-or-death decisions concerning herself or an existing child without parental consent, we are unable to discern a special compelling interest on the part of the state under Florida law in protecting the minor only where abortion is concerned. We fail to see the qualitative difference in terms of impact on the well-being of the minor[9] between allowing the life of an existing child to come to an end and terminating a pregnancy, or between undergoing a highly dangerous medical procedure on oneself and undergoing a far less dangerous procedure to end one's pregnancy. If any qualitative difference exists, it certainly is insufficient in terms of state interest. Although the state does have an interest in protecting minors, "the selective approach employed by the legislature evidences the limited nature of the ... interest being furthered by these provisions." Ivey v. Bacardi Imports Co., 541 So.2d 1129, 1139 (Fla. 1989). We note that the state's adoption act similarly contains no requirement that a minor obtain parental consent prior to placing a child up for adoption, even though this decision clearly is fraught with intense emotional and societal consequences. See ch. 63, Fla. Stat. (1987).
The parental consent statute also fails the second prong of the Winfield standard, i.e., it is not the least intrusive means of furthering the state interest. Any inquiry under this prong must consider procedural safeguards relative to the *1196 intrusion. As pointed out by the district court below, although the instant statute does provide for a judicial bypass procedure, it makes no provision for a lawyer for the minor or for a record hearing.[10] In In re D.B. and D.S., 385 So.2d 83 (Fla. 1980), we recognized that an individual's interest in preserving the family unit and raising children is fundamental, and that in any proceeding involving permanent termination of parental rights, counsel for the affected party is constitutionally required. As noted above, we have determined that a woman's right to decide whether or not to continue her pregnancy constitutes a fundamental constitutional right and this right extends to minors. "[T]here are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible." Bellotti, 443 U.S. at 642, 99 S.Ct. at 3047. In proceedings wherein a minor can be wholly deprived of authority to exercise her fundamental right to privacy, counsel is required under our state constitution. Examining a comparable statute under federal law, the United States Court of Appeals, Seventh Circuit, pointed out:
If the waiver procedure ... simply involved speaking to the judge in order to demonstrate maturity, counsel might not seem essential. But no legal proceeding is that simple. A minor, completely untrained in the law, needs legal advice to help her understand how to prepare her case, what papers to file, and how to appeal if necessary. Requiring an indigent minor to handle her case all alone is to risk deterring many minors from pursuing their rights because they are unable to understand how to navigate the complicated court system on their own or because they are too intimidated by the seeming complexity to try.
Indiana Planned Parenthood Affiliates Ass'n v. Pearson, 716 F.2d 1127, 1138 (7th Cir.1983). We note that even the state in Pearson conceded that "`[t]here can be no doubt that in a case dealing with the abortion decision, refusal to assign counsel to an indigent minor would be reversible error.'" Id.
Without a record hearing to memorialize a trial judge's reasons for denying a petition for waiver of parental consent, appellate review is meaningless. See In re: J.V., a child, 548 So.2d 749 (Fla. 4th DCA 1989) (without record hearing, appellate review is "illusory and meaningless"); In re: E.B.L., a minor, 544 So.2d 333 (Fla. 2d DCA 1989) (appellate court constrained to reverse denial of petition where record non-existent). Without a record, the appellate court will be unable to determine whether the denial was lawful or was simply based on the trial judge's moral, religious, or political beliefs. Additionally, we note that the statute fails to make any exception for emergency or therapeutic abortions, procedures clearly no different, in terms of impact upon the minor, from other medical procedures that a minor can unilaterally authorize under section 743.065. Accordingly, we conclude that the statute fails to provide adequate procedural safeguards.
Based on the foregoing analysis of our state law, we hold that section 390.001(4)(a), Florida Statutes (Supp. 1988), violates the Florida Constitution. Accordingly, no further analysis under federal law is required. We expressly decide this case on state law grounds and cite federal precedent only to the extent that it illuminates Florida law. We approve the district court's decision.
It is so ordered.
BARKETT and KOGAN, JJ., concur.
EHRLICH, C.J., concurs specially with an opinion.
OVERTON, J., concurs in part and dissents in part with an opinion with which GRIMES, J., concurs.
GRIMES, J., concurs in part and dissents in part with an opinion.
McDONALD, J., dissents with an opinion.
*1197 EHRLICH, Chief Justice, concurring specially.
I generally concur with the majority opinion and the result it reaches. I write only to express my disagreement with the definition of "viability" adopted by the majority and to elucidate my views.
I wholeheartedly concur that Florida's express constitutional right of privacy, article I, section 23, Florida Constitution, is implicated in this case. Specifically, I note that the privacy provision was added to the Florida Constitution by amendment in 1980, well after the decision of the United States Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). It can therefore be presumed that the public was aware that the right to an abortion was included under the federal constitutional right of privacy and would therefore certainly be covered by the Florida privacy amendment. See Jenkins v. State, 385 So.2d 1356 (Fla. 1980). As expressed by the majority, it is also clear that the right of privacy extends to minors. See at 1192-1193.
It is therefore necessary for us to decide whether the state has a compelling interest sufficient to outweigh the minor girl's right of privacy, and if so, whether this statute is the least intrusive means of furthering that compelling interest. Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla. 1985). I agree that the state does not have a compelling interest sufficient to support the statute in this case, and even if the state's interest were compelling, I believe this statute is not the least intrusive means of furthering any such interest.
I recognize, as does the majority, that the state has legitimate interests in any restrictions on the ability to obtain an abortion: protecting the health of the mother and protecting the potential life represented by the fetus. As these interests exist throughout pregnancy, see City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 428-30, 103 S.Ct. 2481, 2491-93, 76 L.Ed.2d 687 (1983), the question becomes at what point, if ever, they become compelling so as to outweigh the privacy rights of the individual under article I, section 23.
As to the first state interest, protecting the health of the mother, I agree that we should adopt the United States Supreme Court's analysis: The state's interest in the health of the mother does not become compelling until the point when the abortion procedure becomes equally or more dangerous for the mother than childbirth. Roe, 410 U.S. at 149-50, 93 S.Ct. at 724-25. The Court in Roe identified this point, based on available medical evidence, as approximately at the end of the first trimester. Id. at 163, 93 S.Ct. at 731. Because of advances in medical technology, the specific point at which the state's interest in the health of the mother becomes compelling has become less definite, and may have been extended into the second trimester. City of Akron, 462 U.S. at 429 n. 11, 103 S.Ct. at 2492 n. 11. Once the state's interest in the health of the mother becomes compelling, the state may regulate the abortion procedure in the least restrictive ways that are reasonably related to furthering that state interest. As the Court noted in City of Akron, however, "[t]his does not mean that a State never may enact a regulation touching on the woman's abortion right during the first weeks of pregnancy. Certain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state health objectives." Id. at 430, 103 S.Ct. at 2492. Examples of regulations permissible during the first trimester are requiring informed consent and the maintenance of certain records. See Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). Therefore, to the extent that section 390.001(4), Florida Statutes (Supp. 1988), requires the informed consent of the pregnant woman (adult or minor) it serves a valid purpose. However, I do not believe that this interest can support the parental consent portion of the statute, section 390.001(4)(a), given the fact that the girl is considered competent to give consent to any other medical procedure related to her pregnancy as though she were an adult. § 743.065, Fla. Stat. (1987).
*1198 With regard to the state's interest in potential life, I believe that this Court is not in a position to radically alter the traditional legal view that the unborn are not legal "persons" and decide an issue on which there is no social, religious, philosophical, or scientific consensus, i.e., when life begins. However, the mother's privacy rights cannot be considered in a vacuum. Even though the fetus is not a legal "person," it is a potential life in which the state has an important interest. As the Court noted in Roe:
The pregnant woman cannot be isolated in her privacy. She carries an embryo and, later, a fetus. .. . The situation therefore is inherently different from marital intimacy, or bedroom possession of obscene material, or marriage, or procreation, or education, with which Eisenstadt [v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)] and Griswold [v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)], Stanley [v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)], Loving [v. Com. of Va., 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)], Skinner [v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)] and Pierce [v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)] and Meyer [v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)] were respectively concerned... . The woman's privacy is no longer sole and any right of privacy she possesses must be measured accordingly.
Roe, 410 U.S. at 159, 93 S.Ct. at 730. Therefore, as an essential part of our discussion of the mother's right of privacy guaranteed by the Florida Constitution, we must consider the point at which a line can be drawn separating the time in the pregnancy when the mother's privacy right controls, and the time when the state's interest in the potential life represented by the fetus becomes "compelling" so as to outweigh that privacy right.
The Roe definition of "viability" (i.e., when the fetus is "potentially able to live outside the mother's womb, albeit with artificial aid," 410 U.S. at 160, 93 S.Ct. at 730, because at that point the fetus "presumably has the capability of meaningful life outside the mother's womb," id. at 163, 93 S.Ct. at 731) and that adopted by the majority ("when the fetus becomes capable of meaningful life outside the womb through standard medical measures," at 1194) do not seem to me to be significantly different. The Roe definition allows the use of any medical technology that could allow the fetus to develop to live a meaningful life outside the mother's womb. Once we accept that the point of "viability" is that point at which some type of medical technology may be used, I frankly do not understand how or why we would differentiate between different medical measures, whether currently considered "standard" or "extraordinary," as long as they enable the fetus to survive outside the womb and develop to live a meaningful life. Further, the majority's definition, although limited to "standard medical measures," will ultimately reach the same result because what is considered extraordinary today may be standard tomorrow.
I would prefer to adopt the definition of "viability" as set forth in Roe. Unlike the United States Supreme Court in Roe, we have no record before us, no medical evidence, which would allow us to fashion a new definition at this time, or to determine at what point in gestation a fetus would be "viable" under that new definition. However, I concur because this case involves a pregnancy that had not yet reached the point of "viability" under either definition, and further, because this statute places significant restrictions on the ability of minors to obtain an abortion at any time during pregnancy, not just after the point of "viability."
I recognize that in cases involving minors, the state has an additional interest in protecting the immature minor and the integrity of the family. I agree, however, that in light of section 743.065 the state's interest in the parental consent statute is not compelling.[1] Section 743.065 expressly *1199 grants to a pregnant, unwed minor the ability to consent, as though she were an adult, to medical services relating to pregnancy, except abortion, and to medical services for her child after birth. Decisions relating to the medical services covered under section 743.065 do not differ qualitatively from the decision to have an abortion. For example, under section 743.065, the pregnant minor girl may refuse to consent to medical treatment even though she is informed that without such treatment the fetus will not survive to term. At the heart of that situation, as with abortion, is a decision involving the life or death of the fetus. Yet under this statutory scheme, the minor girl is considered competent to make one decision but not the other. Given this statutory scheme, I must agree that the state has failed to prove that its interest in protecting the immature minor is compelling so as to outweigh the privacy rights of the minor girl.[2]
I also agree that even if the state had a compelling interest sufficient to support this statute, this statute also fails the second prong of the Winfield standard, i.e., it is not the least restrictive means of furthering the state's interest. As the United States Supreme Court noted in Bellotti v. Baird, 443 U.S. 622, 644, 99 S.Ct. 3035, 3048, 61 L.Ed.2d 797 (1979), "the [judicial alternative] procedure must ensure that the provision requiring parental consent does not in fact amount to the `absolute, and possibly arbitrary, veto' that was found impermissible in Danforth" but must "provide an effective opportunity for an abortion to be obtained."
Section 390.001(4)(a) provides for neither a record hearing nor the appointment of counsel for the minor. It only provides that "[a]t its discretion, the court may enter its order ex parte," but must rule within forty-eight hours after the filing of the petition. Indeed, the statute, and our rules implementing it, seem to specifically contemplate that a hearing may not be necessary.[3]See Fla.R.Civ.P. 1.612(c) ("If the court requires a hearing, it shall be held expeditiously."). By contrast, the Missouri consent statute upheld in Planned Parenthood Ass'n v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), provided for a hearing on the record, where
the court shall hear evidence relating to the emotional development, maturity, intellect and understanding of the minor; the nature, possible consequences, and alternatives to the abortion; and any other evidence that the court may find useful in determining whether the minor should be granted majority rights for the purpose of consenting to the abortion or whether the abortion is in the best interests of the minor.
Id. at 479 n. 4, 103 S.Ct. at 2519 n. 4. The Missouri statute also provided for appointment of counsel for the minor if she did not *1200 have private counsel.[4] As the district court below noted, "[t]he procedure established by the [Missouri] statute insured that the court would hold a meaningful hearing and render a deliberative, informed and responsible decision, thus guarding against the possibility of an arbitrary determination." In re T.W., 543 So.2d 837, 840-41 (Fla. 5th DCA 1989). As the majority recognizes, "[w]ithout a record, the appellate court will be unable to determine whether the denial was lawful or was simply based on the trial judge's moral, religious, or political beliefs." At 1196. Further, I seriously question whether an adequate determination of the maturity of a minor can ever be made from cold pleadings, which is permitted under the Florida statute. Because of these significant defects noted by the majority, the Florida judicial alternative procedure does not sufficiently protect against arbitrary decisionmaking. Therefore, it cannot be said to be the least intrusive means of achieving the state's goal.
As a final point, although I would not find the statute so vague as to violate due process under the United States or Florida Constitutions,[5] I would find that the provision constitutes an unconstitutional delegation of legislative authority to the judiciary.
The emergency rule of this Court implementing section 390.001(4)(a) states: "If no judgment is entered within the time period, the petition shall be deemed granted and the clerk shall place a certificate to this effect in the file." Fla.R.Civ.P. 1.612(d) (emphasis added). See also Fla.R.App.P. 9.110(1). Section 390.001(4)(a) itself does not specify what action should be taken in the event no ruling is made within forty-eight hours. Article II, section 3, of the Florida Constitution, provides:
Branches of government.  The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.
In Askew v. Cross Key Waterways, 372 So.2d 913 (Fla. 1978), we recognized that the second sentence of this provision incorporated into the constitution the doctrine of nondelegation.
Under the fundamental document adopted and several times ratified by the citizens of this State, the legislature is not free to redelegate ... so much of its lawmaking power as it may deem expedient....
... .
... Under this doctrine fundamental and primary policy decisions shall be made by members of the legislature who are elected to perform those tasks, and administration of legislative programs must be pursuant to some minimal standards and guidelines ascertainable by reference to the enactment establishing the program.
Id. at 924-25. I believe the question of whether, when a petition is not ruled on within the required time, it should be presumed granted or denied, is a matter of fundamental policy which must be decided by the legislature. The Court, pursuant to its rulemaking power, cannot make such policy. By failing to provide adequate guidelines in this respect, and thereby leaving it up to this Court to determine the effect of the trial court's failure to rule within forty-eight hours, the legislature has unconstitutionally delegated a fundamental policy decision to this Court.
The Supreme Judicial Court of Massachusetts described the right of privacy as "an expression of the sanctity of individual *1201 free choice and self-determination as fundamental constituents of life." Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 742, 370 N.E.2d 417, 426 (1977). That right is expressly guaranteed to the citizens of Florida by article I, section 23, of the Florida Constitution, and it is for this Court to ensure that that right is adequately protected. In my opinion, article I, section 23 is implicated by the significant restriction in section 390.001(4)(a) on the ability of a minor to obtain an abortion at any time during her pregnancy. The statutory scheme before us evidences the limited nature of the state's interest in this legislation, such that it cannot outweigh the privacy rights of the minor girl, nor is it the least intrusive means of furthering any such interest. I agree that section 390.001(4)(a), Florida Statutes (Supp. 1988), is violative of article I, section 23, of the Florida Constitution, and I therefore concur.
OVERTON, Justice, concurring in part, dissenting in part.
I concur in parts I and II; however, I must dissent from the majority's holding in part III. While I agree that section 390.001(4)(a), Florida Statutes (Supp. 1988), is unconstitutional as it was interpreted and applied by the trial court, I would not declare the statute unconstitutional vel non but would interpret the statute so that it can be applied in accordance with the principles set forth by the United States Supreme Court in Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). In that decision, the United States Supreme Court approved this type of statute and stated: "[T]he [judicial alternative] procedure must ensure that the provision requiring parental consent does not in fact amount to the `absolute, and possibly arbitrary, veto' that was found impermissible in Danforth," id. at 644, 99 S.Ct. at 3048 (citation omitted), but must "provide an effective opportunity for an abortion to be obtained." Id.
As explained by Justice McDonald in his concurring and dissenting opinion, a minor has the disability of nonage, including the inability to contract. The legislature has the power to set forth certain instances where the disability is removed. See ch. 743, Fla. Stat. (1987). Our right of privacy provision contained in article I, section 23, of the Florida Constitution, did not absolutely remove a minor's disability of nonage for obtaining an abortion or any other medical procedure, and those parts of the majority opinion in which I have concurred did not, in my view, so hold. The right of privacy provision, adopted by the people of this state in 1980, effectively codified within the Florida Constitution the principles of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), as it existed in 1980. As illustrated by the multiple United States Supreme Court cases construing state statutes relating to parental consent, the principles of Roe did not remove the disability of nonage for a minor to have an abortion. See Planned Parenthood Ass'n v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); Bellotti; Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).
Section 390.001(4)(a) can easily be construed to be within the principles set forth in these cases. By doing so, the statute can be an assistance  not a hindrance  to a minor seeking an abortion. Further, such a statute recognizes parents' basic responsibilities and obligations with regard to their minor children. Their obligations go not only to whether or not a child should have a particular type of medical procedure, but also to what medical facility and personnel should be utilized to perform the procedure.
We have a duty to construe this statute as constitutional if at all possible. We have consistently stated that
[t]his court is committed to the fundamental principle that it has the duty if reasonably possible, and consistent with constitutional rights, to resolve doubts as to the validity of a statute in favor of its constitutional validity and to construe a statute, if reasonably possible, in such a manner as to support its constitutionality *1202  to adopt a reasonable interpretation of a statute which removes it farthest from constitutional infirmity.
Corn v. State, 332 So.2d 4, 8 (Fla. 1976) (footnote omitted, emphasis added). Stated another way, we have a responsibility to "avoid declaring a statute unconstitutional if such statute can be fairly construed in a constitutional manner." Sandlin v. Criminal Justice Standards & Training Comm'n, 531 So.2d 1344, 1346 (Fla. 1988) (citation omitted). See also Vildibill v. Johnson, 492 So.2d 1047 (Fla. 1986); Industrial Fire & Casualty Ins. Co. v. Kwechin, 447 So.2d 1337 (Fla. 1983); Department of Ins. v. Southeast Volusia Hosp. Dist., 438 So.2d 815 (Fla. 1983), appeal dismissed, 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984); Miami Dolphins, Ltd. v. Metropolitan Dade County, 394 So.2d 981 (Fla. 1981); State v. Keaton, 371 So.2d 86 (Fla. 1979); State v. Aiuppa, 298 So.2d 391 (Fla. 1974). Applying this principle of statutory interpretation, the Court would not be changing the intent of the legislature in this case because "[t]he legislature will be presumed to have intended a constitutional result." Sandlin, 531 So.2d at 1346 (citing Marsh v. Garwood, 65 So.2d 15 (Fla. 1953)).
As previously noted, the United States Supreme Court had clearly established the principles by which the constitutionality of this type of parental consent legislation must be judged before the legislature enacted section 390.001(4)(a). I believe that the legislature intended this statute to be constitutional within those principles. I find that the statute can be interpreted to ensure that parental consent does not amount to an absolute veto and this Court can adopt procedures to provide minors with effective opportunities to obtain abortions. Further, I conclude that the majority has abdicated its responsibility by not so construing the statute, thus leaving the legislature with the problem of redrafting a constitutional statute.
For the reasons expressed, I disagree with the majority's reasoning in part III and the result which declares the statute unconstitutional.
GRIMES, J., concurs.
GRIMES, Justice, concurring in part, dissenting in part.
The United States Constitution does not explicitly refer to the right of privacy. However, in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the United States Supreme Court construed the due process clause of the fourteenth amendment to provide a right of privacy with respect to a woman's decision to have an abortion. In several subsequent decisions, the United States Supreme Court has delineated the extent to which the state may qualify or otherwise burden a woman's right to have an abortion.
In 1980, the Florida Constitution was amended to specifically guarantee persons the right to privacy. As a consequence, it was thereafter unnecessary to read a right of privacy into the due process provision of Florida's equivalent to the fourteenth amendment. However, this did not mean that Florida voters had elected to create more privacy rights concerning abortion than those already guaranteed by the United States Supreme Court. By 1980, abortion rights were well established under the federal Constitution, and I believe the privacy amendment had the practical effect of guaranteeing these same rights under the Florida Constitution. If the United States Supreme Court were to subsequently recede from Roe v. Wade, this would not diminish the abortion rights now provided by the privacy amendment of the Florida Constitution. Consequently, I agree with the analysis contained in parts I and II of the majority opinion, which I read as adopting, for purposes of the Florida Constitution, the qualified right to have an abortion established in Roe v. Wade.
In part III, however, the majority opinion interprets the Florida Constitution differently than the United States Supreme Court has interpreted the federal Constitution with respect to a minor's right to an abortion. Recognizing that the constitutional rights of children may not be equated with those of adults, the United States Supreme Court in Bellotti v. Baird, 443 U.S. 622, *1203 633-34, 99 S.Ct. 3035, 3042-43, 61 L.Ed.2d 797 (1979), said:
The Court long has recognized that the status of minors under the law is unique in many respects. As Mr. Justice Frankfurter aptly put it: "[C]hildren have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children." May v. Anderson, 345 U.S. 528, 536, 73 S.Ct. 840, 844, 97 L.Ed. 1221 (1953) (concurring opinion). The unique role in our society of the family, the institution by which "we inculcate and pass down many of our most cherished values, moral and cultural," Moore v. East Cleveland, 431 U.S. 494, 503-504, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (plurality opinion), requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children. We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing.
Referring to the need for parental guidance upon the decisions of minors, the Court went on to say:
Properly understood, then, the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter. Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding. Under the Constitution, the State can "properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." Ginsberg v. New York, 390 U.S. [629], at 639, 88 S.Ct. [1274], at 1280 [20 L.Ed.2d 195 (1968)].
Id. 443 U.S. at 638-39, 99 S.Ct. at 3045-46 (footnotes omitted). In H.L. v. Matheson, 450 U.S. 398, 411, 101 S.Ct. 1164, 1172, 67 L.Ed.2d 388 (1981), the Court acknowledged the impact of abortion on a minor when it said that:
The medical, emotional, and psychological consequences of an abortion are serious and can be lasting; this is particularly so when the patient is immature.
Thus, the United States Supreme Court has consistently recognized that a state statute requiring parental consent to a minor's abortion is constitutional if it provides a judicial alternative in which the consent is obviated if the court finds that the minor is mature enough to make the abortion decision or, in the absence of the requisite maturity, the abortion is in the minor's best interest. Planned Parenthood Ass'n v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); Bellotti.
While purporting to acknowledge the state's interest in protecting minors and in preserving family unity, the majority reaches the conclusion that these interests as reflected in the instant statute must fall in the face of its broad interpretation of the privacy amendment. In effect, the Court has said that the state's interest in regulating abortions is no different with respect to minors than it is with adults. Under this ruling, even immature minors may decide to have an abortion without parental consent. I do not agree with either the majority's broad interpretation of the privacy amendment or its limited view of the state's interest concerning the conduct of minors.
Moreover, I cannot accept the majority's conclusion that section 743.065, Florida Statutes (1987), which permits an unwed pregnant minor to consent to the performance of medical or surgical care except with respect to abortions, somehow makes the statute under consideration in the instant case unconstitutional. Section 743.065 was designed to permit doctors to avoid liability for providing medical services *1204 to minors without parental consent and to ensure that emergency treatment would be available. The decision to have an abortion is clearly different than the decision to undergo other medical or surgical care with respect to pregnancy, and the legislature has a right to determine that different criteria should be followed with respect to consenting to an abortion.
I must also disagree that the statute is unconstitutional because it does not provide for the appointment of an attorney for an indigent minor. While the Missouri statute approved in Planned Parenthood v. Ashcroft did provide for appointed counsel, the opinion in that case gave no indication that this was constitutionally required. In Lassiter v. Department of Social Services, 452 U.S. 18, 25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981), the United States Supreme Court said:
The pre-eminent generalization that emerges from this Court's precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation.
The Court went on to hold that there may be circumstances on a case-by-case basis in which counsel should be appointed for indigent parents in state termination proceedings. However, even in those cases where indigent persons stood to lose all of their parental rights, the Court rejected the notion that due process always required the appointment of counsel. In any event, that Court has never intimated that a minor has a constitutional right to counsel with respect to court proceedings concerning the right to have an abortion without parental consent. The statute involved in this case together with the accompanying rules of procedure are drawn in such a way as to simplify the judicial proceeding so that the minor will not be prejudiced by not having a lawyer.
Finally, the fact that a statute does not require a record hearing to memorialize the judge's findings has never been deemed the basis to hold a statute unconstitutional. The Missouri statute upheld in Ashcroft contained no provision for a record. In any event, if a record were constitutionally necessary, this could be easily remedied by amending our rules of procedure.
It is this Court's duty to uphold the constitutionality of statutes whenever this can be done consistent with sound legal principles. Corn v. State, 332 So.2d 4 (Fla. 1976). Clearly, this statute is valid under our federal Constitution as interpreted by the United States Supreme Court. Admittedly, this Court has the authority to give the Florida Constitution a broader interpretation, but there should be a compelling reason for taking such a step.
Practically any law interferes in some manner with someone's right of privacy. The difficulty lies in deciding the proper balance between this right and the legitimate interest of the state. As the representative of the people, the legislature is charged with the responsibility of deciding where to draw the line. Only when that decision clearly transgresses private rights should the courts interfere.
Here, the legislature has concluded that it is ordinarily desirable that a minor should have the advice and consent of her parents before having an abortion. However, by providing a judicial alternative which is simple, speedy, and confidential, the legislature has also ensured that an abortion will be denied to a minor only when she is too immature to make the decision and when it is against her best interest. Section 390.001(4)(a)(1), Florida Statutes (Supp. 1988), reflects a legitimate state concern over the welfare of children and impinges upon the minor's right to privacy in the least intrusive manner. I would uphold the constitutionality of the statute.
McDONALD, Justice, dissenting.
I disagree that section 390.001(4)(a), Florida Statutes (Supp. 1988), is unconstitutional.[1] On the other hand, there is much in the majority opinion with which I agree. I *1205 disagree with the majority not because I differ from its legal or philosophical conclusion on an adult woman's right of privacy and her right to make a personalized and unimpeded decision on whether to terminate a pregnancy. I have no problem in embracing the rationale of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), particularly when this state has adopted a constitutional right of privacy. I agree with the majority's discussion of this as it relates to adults. In short, if this case were on the subject of a legislative intrusion on an adult woman's right to have an abortion, I would concur.[2]
My principal disagreement lies in my conclusion that, absent an enabling statute, a minor does not have the capacity to consent to an abortion. This is because of the common law and long-recognized disability of minors because of nonage. A minor lacks the capacity to contract. When she consents to an abortion she contracts with another person to perform a surgical procedure on her. Absent parental or statutory authorization, she cannot do this. A minor's incapacity was recognized by the legislature when it enacted section 743.065, Florida Statutes (1987), authorizing the power to consent for certain medical procedures.[3] The legislature chose to exclude its grant of consent power to abortion medical procedures. It did the same in section 743.066, Florida Statutes (1989). Even if we question the wisdom of the legislature, the judiciary does not have the power to extend the capacity to consent by a minor beyond that granted by the legislature.[4] I do not look upon § 390.001(4)(a) as an invasion of privacy, but rather a method of providing a vehicle to fulfill a pregnant minor's desire to terminate a pregnancy. Viewed in that light, the statute is constitutional.
I do not believe any procedural deficiencies in the statute make it unconstitutional. Procedure is the responsibility of this Court. We have provided a procedural rule to accompany the statute. If additional procedural safeguards are indicated, we can provide those. The statute need not die on this basis.
Some judges may not like to make the ultimate decision to grant or deny a consent for an abortion when he or she finds that a minor is so immature she cannot competently do so herself. It may be a hard decision, but dislike and hardship do not translate into unconstitutionality. It is the duty of judges to make hard decisions. That is one reason we have them.
In conclusion, I find the statute both permissive and constitutional. I do not believe it trespasses upon a minor's right of privacy. For many purposes, minors are treated differently. It does not offend me in the slightest that their ability to consent to an abortion is different from adults and is an issue appropriately left with the legislature.
NOTES
[1] Section 390.001(4)(a), Florida Statutes (Supp. 1988), provides:

1. If the pregnant woman is under 18 years of age and unmarried, in addition to her written request, the physician shall obtain the written informed consent of a parent, custodian, or legal guardian of such unmarried minor, or the physician may rely on an order of the circuit court, on petition of the pregnant unmarried minor or another person on her behalf, authorizing, for good cause shown, such termination of pregnancy without the written consent of her parent, custodian, or legal guardian. The cause may be based on: a showing that the minor is sufficiently mature to give an informed consent to the procedure; the fact that a parent, custodian, or legal guardian unreasonably withheld consent; the minor's fear of physical or emotional abuse if her parent, custodian, or legal guardian were requested to consent; or any other good cause shown. At its discretion, the court may enter its order ex parte. If the court determines that the minor is sufficiently mature to give an informed consent to the procedure, the court shall issue an order authorizing the procedure without the consent of her parent, custodian, or legal guardian. If the court determines that the minor is not sufficiently mature, the court shall determine the best interest of the minor and enter its order in accordance with such determination.
2. The court shall ensure that a minor who files a petition pursuant to this paragraph will remain anonymous. The minor may participate in proceedings in the court on her own or through another person on her behalf. Court proceedings brought pursuant to this paragraph are confidential and shall be given the priority necessary for the court to reach a decision promptly. The court shall rule within 48 hours after the petition is filed; but the 48-hour limitation may be extended at the request of the minor. An expedited anonymous appeal shall be made available to a minor who files a petition pursuant to this paragraph.
3. The Supreme Court may promulgate any rules it considers necessary to ensure that proceedings brought pursuant to this paragraph are handled expeditiously and are kept confidential.
[2] Florida Rule of Civil Procedure 1.612 provides:

TERMINATION OF PREGNANCIES OF UNMARRIED MINORS
(a) Commencement. The action shall be commenced by filing a petition in circuit court by the unmarried minor or another person on her behalf.
(b) Petition. No defect in the form of the petition shall impair substantial rights and no defect in the statement of jurisdictional facts shall render any proceeding void. The petition for termination of pregnancy shall state:
(1) The interest of the petitioner and his or her name and address.
(2) The date of birth of the minor.
(3) The name, last known address, and telephone number of the parents, custodian, or legal guardian of the minor.
(4) That the minor is under age of 18 years and unmarried.
(5) That the minor is pregnant.
(6) A short and plain statement of the facts and a reasonable basis for establishing any of the following:
(A) That the minor is sufficiently mature to give an informed consent to the procedure; or
(B) That consent of the parent, custodian, or legal guardian is being unreasonably withheld; or
(C) That the facts justify the minor's fear of physical or emotional abuse if her parent(s), custodian(s), or legal guardian(s) were requested to consent; or
(D) Any other good cause.
(c) Hearing. At the discretion of the court an order on the petition may be entered ex parte. If the court requires a hearing, it shall be held expeditiously. The clerk shall give notice to the minor and any petitioner on her behalf before the hearing.
(d) Judgment. The court shall enter a judgment within 48 hours after the petition is filed unless the time is extended at the request of the minor. The judgment shall recite findings in support of the ruling. If no judgment is entered within the time period, the petition shall be deemed granted and the clerk shall place a certificate to this effect in the file.
(e) Confidentiality. The proceedings shall be confidential so that the minor shall remain anonymous. The file shall be sealed unless otherwise ordered by the court. If the petition is granted, the clerk shall furnish a certified copy of the judgment or clerk's certificate to the petitioner for delivery to the minor's physician.
Florida Rule of Appellate Procedure 9.110 provides in part:
(l) Exception. Where an unmarried minor or another person on her behalf appeals an order denying a petition for termination of pregnancy, the district court of appeal shall render its decision on the appeal as expeditiously as possible and by no later than ten days from the filing of the notice of appeal. Briefs or oral argument may be ordered at the discretion of the district court of appeal. If no decision is rendered within the foregoing time period, the order shall be deemed reversed, the petition shall be deemed granted, and the clerk shall place a certificate to this effect in the file. The appeal and all proceedings thereon shall be confidential in order that the minor shall remain anonymous. The file shall remain sealed unless otherwise ordered by the court. Should the petition be granted, the clerk shall furnish the petitioner a certified copy of the decision or clerk's certificate for delivery to the minor's physician.
[3] We are compelled to comment on the trial judge's finding that the court, "as the only entity otherwise involved [i]n the proceeding which could possibly protect the state's interest," could have standing to challenge the constitutionality of the statute. Under no circumstances is a trial judge permitted to argue one side of a case as though he were a litigant in the proceedings. The survival of our system of justice depends on the maintenance of the judge as an independent and impartial decisionmaker. A judge who becomes an advocate cannot claim even the pretense of impartiality.
[4] See Alaska Const. art. I, § 22; Cal. Const. art. I, § 1; Mont. Const. art. II, § 10. A second group of states has incorporated the privacy right into a constitutional provision dealing with additional matters. See Ariz. Const art. II, § 8; Haw. Const. art I, §§ 6, 7; Ill. Const. art. I, §§ 6, 12; La. Const. art. I, § 5; S.C. Const. art. I, § 10; Wash. Const. art. I, § 7.
[5] Justice White has pointed out that "[f]undamental liberties and interests are most clearly present when the Constitution provides specific textual recognition of their existence and importance." Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 2194, 90 L.Ed.2d 779 (1986) (White, J., dissenting).
[6] Restrictions to protect the state's interest in the potentiality of life, as explained infra, also may be imposed, but only after viability, as defined infra, is reached.
[7] As to the argument that the state's interest in the potentiality of life is compelling throughout pregnancy, Justice Stevens has noted:

I should think it obvious that the state's interest in the protection of an embryo  even if that interest is defined as "protecting those who will be citizens,"  increases progressively and dramatically as the organism's capacity to feel pain, to experience pleasure, to survive, and to react to its surroundings increased day by day. The development of a fetus  and pregnancy itself  are not static conditions, and the assertion that the government's interest is static simply ignores this reality.
Nor is it an answer to argue that life itself is not a static condition, and that "there is no nonarbitrary line separating a fetus from a child, or indeed, an adult human being." For, unless the religious view that a fetus is a "person" is adopted... there is a fundamental and well-recognized difference between a fetus and a human being; indeed, if there is not such a difference, the permissibility of terminating the life of a fetus could scarcely be left to the will of the state legislatures. And if distinctions may be drawn between a fetus and a human being in terms of the state interest in their protection  even though the fetus represents one of "those who will be citizens"  it seems to me quite odd to argue that distinctions may not also be drawn between the state interest in protecting the freshly fertilized egg and the state interest in protecting the 9-month-gestated, fully sentient fetus on the eve of birth. Recognition of this distinction is supported not only by logic, but also by history and by our shared experiences.
Thornburgh, 106 S.Ct. at 2188 (Stevens, J., concurring) (footnotes and citations omitted).
[8] See City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 427 n. 10, 103 S.Ct. 2481, 2491 n. 10, 76 L.Ed.2d 687 (1983) ("[T]he Court has repeatedly recognized that, in view of the unique status of children under the law, the States have a `significant' interest in certain abortion regulations aimed at protecting children `that is not present in the case of an adult.'"); H.L. v. Matheson, 450 U.S. 398, 441 n. 32, 101 S.Ct. 1164, 1188 n. 32, 67 L.Ed.2d 388 (1981) (Marshall, J., dissenting) ("Although it may seem that the minor's privacy right is somehow less fundamental because it may be overcome by a `significant state interest,' the more sensible view is that state interests inapplicable to adults may justify burdening the minor's right.").
[9] Having already examined the state's interest in the potentiality of life in the fetus, we are concerned here only with the state's interest in the well-being of the minor.
[10] By contrast, the Missouri consent statute upheld in Planned Parenthood Ass'n v. Ashcroft, 462 U.S. 476, 479 n. 4, 103 S.Ct. 2517, 2519 n. 4, 76 L.Ed.2d 733 (1983), provided for a record hearing and appointed counsel.
[1] Where fundamental rights are involved, the United States Supreme Court has expressly and repeatedly held that state restrictions on those rights must be supported by a "compelling state interest." Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). The majority assumes that a standard less than "compelling" is being applied to minors by that Court because the Court describes the state's interests relative to minors as "significant," and later determines that those interests are sufficient to outweigh the privacy rights of the minor. See at 1194. However, the Court never expressly states that proposition. Therefore, it is equally valid to conclude that because the state's interests relative to minors are sufficient to outweigh the minor's privacy rights, those interests must also be "compelling" in those circumstances. The term "significant" may be merely descriptive, as are the terms "important" and "legitimate," which the Court has also used to describe state interests in abortion regulations. See, e.g., Roe, 410 U.S. at 163, 93 S.Ct. at 731.
[2] Justice McDonald raises the concern in his opinion that "any person performing an abortion on a minor without a statutorily authorized or parental consent is guilty of committing a battery and is subject to both civil and criminal penalties." At 1205 n. 3 (McDonald, J., dissenting). Section 743.065, Florida Statutes (1987), will provide that statutory authorization in light of the fact that by this decision the only exception to section 743.065, section 390.001(4)(a), is being declared unconstitutional.
[3] For this reason, I do not believe that the lack of a requirement of a hearing may be cured by rule of this Court, even if arguably the lack of any provision for appointment of counsel or a record of such a hearing could be cured by rule.
[4] Missouri Revised Statute § 188.028 (Supp. 1982) (requiring parental consent or judicial consent), at issue in Planned Parenthood Ass'n v. Ashcroft, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), provided that "if the minor does not have private counsel ... the court should appoint counsel" and required "[a] hearing on the merits of the petition, to be held on the record." Id. at 479 n. 4, 103 S.Ct. at 2519 n. 4. (emphasis added).
[5] The trial court and the district court also found the statute unconstitutionally vague because it gives no guidance as to what constitutes "maturity." I disagree. This language is straight out of the United States Supreme Court opinions on this issue. See Ashcroft, 462 U.S. at 491, 103 S.Ct. at 2525. Further, this type of decision is one that judges are frequently called on to make (e.g., competency, best interests of a child, etc.).
[1] In addition to my comments, I approve and endorse the views and rationale of Justices Overton and Grimes on the constitutionality of this statute.
[2] I neither concur nor reject the majority opinion's definition of the viability of a fetus. This discussion is not relevant in determining whether section 390.001(4)(a)(1), Fla. Stat. (Supp. 1988), is constitutional. The conclusions announced by the majority are not predicated on any facts in this case and should not be addressed.
[3] The disability of nonage is also recognized in art. III, § 11(a)(17), Fla. Const.
[4] It appears to me that any person performing an abortion on a minor without a statutorily authorized or parental consent is guilty of committing a battery and is subject to both civil and criminal penalties.